KUNTZ, J.

UNITED STATES DISTRICT COURT     BLOOM, M.J.
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Ras OMeil NOVado MORgan       **CV 17 - 6454**
also known as Ras NAGrom,

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff,

- Against –



THE CITY OF NEW YORK,
LIEUTENANT ONE, "Caucasian Male"
SERGEANT ONE "African Male",
OFFICER WARREN LAU, shield no. 12575
POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"

Defendants.
-----------------------------------------------------------------X

### PRELIMINARY STATEMENT

The Pro Se Plaintiff, Ras OMeil NOVado MORgan, pursuant to provisions of

28 U.S.C. § 1654, Complaint against defendants' THE CITY OF NEW YORK;

LIEUTENANT ONE (Caucasian male), NYPD 067th precinct; SERGEANT One

(African Male), NYPD 067th precinct; OFFICER WARREN LAU, shield no. 12575,

NYPD 067th precinct; POLICE OFFICER ONE (Caucasian Female) Hernse "She

Devil", NYPD 067TH precinct, respectfully set forth upon information known, and

belief, allege that:

1.     This is a civil rights action for equitable relief and money damages pursuant to

42 U.S.C. §§§ 1983, 1981(a)(c), and 1988(a)(c), 1981(a)(c), and 1988(a)(c), in order

vindicate the rights of a law-abiding New York City resident to be free from

unconstitutional and unlawful stop and search by members of the City of New York

Police Department.  It is alleged that the individual police officer defendants

committed false arrest; unlawful imprisonment; malicious prosecution; malicious abuse of process; failure to intervene; assault and battery; illegal search; negligence; gross negligence; negligent screening, hiring, training, retention, and supervision; intentional infliction of emotional distress; negligent infliction of emotional distress; prima facie tort; conspiracy; violation of privacy; deprivations of the claimant's birth rights through God Law; claimant's rights, via United States of America Constitution Article VI, specifically "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the land, through Universal Human Rights Declaration Articles 4, 5, 7, 9,12; and rights through the 1st, 4th, 5th, 6th, 8th, 13th, and 14th Amendments to the United States of America Constitution, and the STATE of NEW YORK Constitution.

2.    The New York City Police Department's Stop, Question and Frisk program has grown over 700% over the past decade and has become one of the cornerstone policies of law enforcement in the city.  The controversy of constitutionality surrounding this program has grown alongside it, with the legitimacy of the program questioned in a multitude of articles, reports, and lawsuits.  The data released to the City Council by the New York City Police Department (NYPD) summarizing stop-and-frisk statistics for 2011 shows highest yearly total stops to date – 684,330 – with no meaningful change in huge racial disparities. This total is 14 percent higher than the number of stops in 2010, and it represents a more than 600 percent increase since 2002, the year the NYPD began keeping stop-and-frisk figures. Eighty-seven percent of those stopped in 2011 were Black or Latino, and the abysmally low rates of correlation between stops and actual arrests persist: nine out of ten persons stopped were not arrested, nor did they receive summonses.

3.   Of the nearly 2.5 million or roughly 500,000 per year people stop-and-frisks that
NYPD conducted in 2005 to 2009, nearly 90% were engaged in entirely lawful
activity, as they were neither arrested nor issued a summons.  Members of the
minority communities are bearing the brunt of these NYPD practices, with Blacks and
Latinos being the target of nearly 90% of NYPD stops.

4.   The NYPD is using its sweeping stop-and-frisk operation to build a massive
database of law-abiding, Blacks and Latinos, New York City residents.  After
conducting stops and frisk, police officers complete forms that, among other things,
include the name and address of the person stopped, and that information is then
entered into a centralized NYPD database.  As a result of this practice and the surge of
stops and frisks over the last several years, the NYPD now has a database of hundreds
of thousands if not more than millions of law-abiding New Yorkers, like plaintiff who
is now at risk of becoming the subject of criminal investigations by virtue of being in
the database.

5.   Plaintiff alleges, as a consequence of his arrest, he has a permanent scar on his
clean record. Because the CITY OF NEW YORK Police Department began
photographing the irises of people arrested in Manhattan in 2010, Plaintiff iris was
taken and scan by device against his protest. As a result of the incident, plaintiff
injuries, of physical, mental anguish and emotional damages still have not gotten any
better.  Plaintiff alleges that since his iris was photographed then scanned with device
his eyes feels like something is in his eyes.

6.   As a result of their actions, the defendants' have violated Ras MORgan rights
under the Universal Human Rights Declaration, the United States Constitution and
under the Constitution and laws of the State of New York.  Plaintiff seeks a

declaration that the defendants' actions have been unlawful, injunctive relief, declaratory relief, and damages.

## PARTIES

7.    Plaintiff, Ras OMeil NOVado MORgan, by the Julian calendar, is a 32-year-old Rastafari Ethiopian African Melaninated male with faith in His Imperial Majesty Emperor Haile Selassie I.  Ras OMeil MORgan wears a turban as a Priest in the ancient priesthood order of Melchisedec, in his way of living a spiritual life through our Holy Father Supreme.  Ras MORgan was birth in Jamaica and is a naturalized Citizen of the United States of America and Citizen of New York State.  Ras MORgan is a social-entrepreneur, a freelance photographer, and a student currently enrolled at City University of New York Medgar Evers College, a senior pursuing a Bachelor of Science in Public Administration with focus in Criminal justice administration.

8.    Defendant, THE CITY OF NEW YORK is a municipal corporation duly incorporated and existing pursuant to laws of the State of New York.  The City of New York has established and maintains the New York City Police Department (NYPD) as a constituent department or agency.

9.    Defendant police officer WARREN LAU, shield no. 12575, NYPD Cmd: PBBKS, 3rd Floor at 67 precinct, 2820 Snyder Ave, Brooklyn, NY 11226, is or was an employee of the NYPD at all relevant times.  He is sued in his official and individual capacities.

10.    Defendant police officer SERGEANT ONE, "African Male", shield no. ?, NYPD's 67 precinct, 2820 Snyder Ave, Brooklyn, NY 11226, is or was an employee of the NYPD at all relevant times.  He is sued in his official and individual capacities.

11.     Defendant LIEUTENANT ONE, "Caucasian Male", shield no. ?, NYPD's 67 precinct, 2820 Snyder Ave, Brooklyn, NY 11226, is or was an employee of the NYPD at all relevant times.  He is sued in his official and individual capacities.

12.     Defendant OFFICER ONE, "Caucasian Female" Hernse "She Devil", shield no. ?, NYPD's 67 precinct, 2820 Snyder Ave, Brooklyn, NY 11226, is or was an employee of the NYPD at all relevant times.  She is sued in her official and individual capacities.

## FACTS

### The Stop, Question, and Frisk Program

13.     Police stops-and-frisks without reasonable suspicion violate the Fourth Amendment, and racial profiling is a violation of fundamental rights and protections of the Fourteenth Amendment and the Civil Rights Act of 1964.  In recent years, the New York City Police Department's Stop, Question, and Frisk program has grown into a controversial cornerstone of police activity in New York.  In the last 10 years alone, the program has grown sevenfold, from 97,296 stops in 2002 to nearly 600,000 stops in 2011.  The controversy surrounding this program has grown with it, with activists, news organizations, and others focusing substantial attention on the program and calling for reform on a variety of issues related to the program.  Controversial aspects of the program include the alleged pervasive use of racial profiling and a widespread pattern of stops being made without adequate legal justification.

14.     One of the most controversial aspects is the apparent racial bias in the targeting of both neighborhoods and individuals.  This controversy has been extensively covered by major media outlets and other news organizations and has culminated in multiple lawsuits, including *Floyd v. City of New York,* a class action, which ruled against City of New York in the Southern District of New York, for violation of

United States Constitution. The NYPD's most recent data demonstrate these racial

disparities, showing that while the population of New York City is only 54 percent

Black or Hispanic, over 87 percent of those stopped were Black or Hispanic. This

racial imbalance in the implementation of the Stop, Question, and Frisk program

extends beyond the individuals stopped to the neighborhoods targeted for

enforcement. For example, each of the four most active precincts for Stop, Question,

and Frisk activity has a population that is majority Black and Hispanic.

<center>Arrest and Detention of OMeil Morgan</center>

15.    Plaintiff, Ras OMeil NOVado MORgan, by Julian calendar is a 32-year-old

Melaninated Ethiopian African Male, who prior to October 1, 2010, had never been

stopped, frisked or arrested by City of New York Police Department Officers'.

16.    On Sunday 2nd of November 2014 beginning at approximately 10:10 p.m., on

Bob Marley Boulevard formerly Church Avenue at the corner of East 55th Street,

Brooklyn, New York.

17.    Plaintiff alleges, shortly after 10:10pm on November 2, 2014, at the above-

mentioned location, claimant was traveler in automobile on the roadway when NYPD

police officers racially motivated illegally stopped, grabbed, and searched claimant

and place overly tight handcuffs on claimant's wrist. Without any reasonable grounds

to think that Ras Morgan had committed or was about to commit a crime. Plaintiff

while stopped at traffic light on red light saw then heard police siren as light turned

green. Plaintiff responded by pulling over across intersection at East 55st on Bob

Marley Boulevard (formerly Church Ave).

18.    Prior to getting out of motor vehicle, Plaintiff dialed 911 out of fear for his life

of Police. Then, Officer LAU frisked and searched Ras. MORgan. Plaintiff was

handcuffed against his will without any reason given as he repeatedly asked Officer
LAU,

19.    Upon Information and belief, Ras MORgan was told by Sergeant "African
Male", one of the NYPD Officers who came on the scene that because of plaintiff
calling 911 for ambulance will cause for the entire arrest process to be done to him.

20.    As a result of the incident, with much excitement and many on-lookers from the
many police vehicles and many officers on the scene, Ras MORgan felt shamed and
humiliated while being taken to NYPD car by Officer Lau.

21.    Ras MORgan was put to sit in Police car with Police Officer LAU and other
Officers standing outside conversing, before FDNY EMS ambulance arrived on scene.

22.    Ras MORgan was asked by FDNY EMS Agent, who came on scene while he sat
in the back seat of Officer LAU NYPD marked car, if he wished to be taken to
hospital that Ras Morgan said yes. As a result, Officer LAU removed Ras Morgan
from police car to put him in ambulance. (Exhibit #1 FDNY CAD#3728 Patient
Information disclosure and assignment of claim)

23.    While in ambulance at scene of incident, SERGEANT ONE "African Male",
who came on scene after Ras MORgan is handcuffed, came to ambulance door, which
was open, with other officers behind him. Ras MORgan alleges SERGEANT ONE
"African Male" speaking aggressively and angry as to why ambulance was called and
fact that Ras Morgan would have been release from precinct, but "would now be
process through the criminal justice process". With serve anxiety, Ras MORgan
asked if it's his right to not answer SERGEANT ONE "African Male". As such,
Plaintiff didn't answer SERGEANT ONE "African Male", which caused SERGEANT
ONE "African Male" to get even angrier.

24.   After some time at scene, Ras MORgan was taken to Kings County Hospital

Emergency Department to address to anxiety he felt from interaction with NYPD. Ras

Morgan was seen by physician Wiener, Sage with diagnosis anxiety stated,

unspecified and disposition discharged to home or self-care. (Exhibit #2 KCHC

Mr#2677577 Patient Discharge report)

25.   After leaving Kings County Hospital in a NYPD marked car with Officer Lau

and two other Officers.  When plaintiff arrived at 67th Precinct, Ras. MORgan again

asked why he was being arrested.  Officer LAU refused to explain to Ras MORgan

why he had been arrested.

26.   At City of New York 67th Precinct, Ras MORgan was taken in front of

Defendant Sergeant "African Male" to verify property.  Ras MORgan explained to

Sergeant "African Male" that he was not told why he was arrested.

27.   Ras. MORgan turban was removed by Officer WARREN LAU in holding area

at 67th Precinct against his will while being held by four NYPD Officers and at

command of LIEUTENANT ONE, "Caucasian Male", who told Officers to hold

plaintiff, who did not resist, for Officer Lau, who forcefully removed plaintiff turban.

Because plaintiff refuse to be photographed and fingerprinted, Ras MORgan was put

in a filthy smelling holding cell by himself.

28.   After some time in the filthy smelling cell, Plaintiff was taken to another holding

area by Officer Lau to be photograph and fingerprinted. As plaintiff turban was not

return to him after being removed by Officer Lau, Plaintiff took his red shirt, he was

wearing, to wrap his head.  At this point SERGEANT ONE "African Male" began

screaming at Officer Lau to "control your perp" because plaintiff protested being

fingerprinted and photographed. Plaintiff was photographed with his head covered

with his shirt at City of New York 67th Precinct against his protest.  Plaintiff was not

fingerprinted at City of New York 67th Precinct because of his protest.

29.    Following, plaintiff was then placed in holding cell with other prisoners.  While

in holding cell, LIEUTENANT ONE, "Caucasian Male" told plaintiff of being held at

precinct until he was fingerprinted. As such, Plaintiff refused to speak with

LIEUTENANT ONE, "Caucasian Male", whose threat to Ras MORgan was indefinite

detention.  After some time, the prisoners were taken from holding cell.  Plaintiff sat

in cell by himself for some time.  Eventually, plaintiff was re-handcuffed and given

his turban that was forcefully removed by Officer Lau and taken to NYPD van that

had the other prisoners who were in holding cell.  Now, in CITY OF NEW YORK

Police department Van, Plaintiff, prisoners, Officer LAU, POLICE OFFICER ONE

"Caucasian Female" Hernse "She Devil" as she called herself, Officers Driver and

Passenger.  The van stopped on Coney Island Avenue, before reaching central

booking, to drop off Officer Lau, who plaintiff would see again after being

photographed and put in cell with other prisoners at Central Booking.

30.    As van drove to Central booking, POLICE OFFICER ONE "Caucasian Female"

Hernse "She Devil" was aggressive and loud towards plaintiff as she told other

prisoners' that plaintiff was to be blamed for them waiting for at least one-hour prior

to van leaving 67th Precinct.  Plaintiff was told by Officer "She Devil" of him being

held indefinite at Central booking because he was not fingerprinted at City of New

York 67th Precinct.  Plaintiff refused to speak with Officer "She Devil".

31.    At Central Booking, plaintiff, against his will was force to remove shirt he used

to cover his head since his turban was forcefully removed at CITY of NEW YORK 67

precinct, was photographed without his head covered although  he was photographed

with his head covered at CITY of NEW YORK 67 precinct. Furthermore, Plaintiff Iris

was photographed and scanned by device against his will. Additionally, Officer LAU took plaintiff from holding cell to be fingerprinted against his will to then be examined by two female medical staff, to whom plaintiff expressed anxiety he's experiencing. Upon Information and belief, the defendants' police officers had no warrant for the arrest of Ras Morgan. Upon Information and belief, at no time during the events described was Ras. Morgan intoxicated, incapacitated, a threat to the safety of himself or others, or disorderly. He had not committed any criminal offenses. As a result of the incident, Ras Morgan worries about being apprehended or worst by the CITY OF NEW YORK police department agents.

32. As a result of the incident, Ras Morgan arrest and summonses required him to appear in Criminal Court of the City of New York County of Kings in January 2015. In addition, Ras MORgan filed complaint, with Civilian Complaint Board, Saturday, November 2014 (Exhibit #3 Re: OCD 201411263 Dated November 6, 2014), to report what he felt was a violation of his rights. Furthermore, the arrest created much anxiety for Ras MORgan due to his first false arrest by NYPD on October 1, 2010.

33. As a result of the incident, Ras MORgan had emergency room treatment only at Kings County Hospital Medical Center Emergency room due to severe anxiety of the CITY OF NEW YORK Police department agents (Exhibit 2). As a result of the incident, Ras MORgan to-date suffers from injuries.

34. On January 26, 2015, Ras Morgan, by Pro Se, served a notice of claim (Exhibit #4 Claim No: 2015PI002420 Dated January 26, 2015), upon the Comptroller of the City of New York, pursuant to 50-e of the New York General Municipal Law. Plaintiff received letter from City of New York Comptroller (Exhibit #5 Claim No: 2015PI002420 Dated January 30, 2015). Additionally, Plaintiff receive from City of New York Comptroller (Exhibit #6 Notice of 50-H Hearing). As such, Plaintiff had

50-H Hearing on May 27, 2015 (Exhibit #7 50-H Hearing Transcript BLA#: 2015PI002420)

35.     After many NYC criminal court appearance, on his 7th appearance, Ras Morgan Charge was ultimately dismissed on July 14, 2015 (Exhibit #8 CCCNY Certificate of Disposition Date July 23, 2014 No: 549216). Resulting from dismissal, plaintiff presented for settlement of matter to City of New York Comptroller. (Exhibit #9 Claimant's First Settlement Importune Dated October 26, 2015 Claim No: 2015PI002420)

36.     Upon information and belief, the violation of Ras Morgan's rights resulted from the improper training of Officer WARREN LAU, POLICE OFFICER ONE "Caucasian Female" Hemse "She Devil", SERGEANT ONE "African Male", LIEUTENANT ONE, "Caucasian Male".  Upon information and belief, it was the policy and/or custom of the City of New York to improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated by the City of New York, including, but not limited to, plaintiff's incident.

## JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(3)-(4);

38.     This Court has supplemental jurisdiction over all state constitutional and state law claims pursuant to 28 U.S.C. § 1367 (a);

39.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Plaintiff's claims arise in the Eastern District of New York.

## CAUSES OF ACTIONS

### COUNT I
### MONELL CLAIM IN VIOLATION OF 42 U.S.C. § 1983

40.  Plaintiff re-alleges Paragraphs 1 through 39 and incorporates them by reference as Paragraphs 1 through 39 of Count I of this Complaint.

41.  Plaintiff alleges that defendants' THE CITY OF NEW YORK; OFFICER WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" caused plaintiff injuries

42.  Plaintiff alleges that defendants' THE CITY OF NEW YORK; Officer WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" actions were taken under color of law.

43.  Plaintiff alleges that defendants' THE CITY OF NEW YORK; Officer WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" deprived plaintiff of his human, constitutional and statutory rights.

44.  Plaintiff alleges that defendants' THE CITY OF NEW YORK; OFFICER WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" actions are causally related to his injuries.

45.  Plaintiff alleges that as a result of the defendants' THE CITY OF NEW YORK; OFFICER WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" actions caused his damages.

46.   Plaintiff alleges that an official policies: Broken Window and Stop, Question, and Frisk, of the CITY OF NEW YORK Police Department caused his human rights, constitutional and statutory injuries.

## COUNT II
### IMPROPER HIRING IN VIOLATION OF 42 U.S.C. § 1983

47.   Plaintiff re-alleges Paragraphs 1 through 46 and incorporates them by reference as Paragraphs 1 through 46 of Count II of this Complaint.

48.   Plaintiff alleges that defendant THE CITY OF NEW YORK deprived him of his constitutional rights by hiring defendants' Officer WARREN LAU, POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil"; SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male"

49.   Plaintiff alleges that defendant THE CITY OF NEW YORK decision to hire defendants' Officer WARREN LAU, POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil", SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" reflects a deliberate indifference to the risk that a violation of a human, constitutional or statutory right would follow.

50.   Plaintiff alleges that as a result of defendant THE CITY OF NEW YORK decision to hire defendants' Officer WARREN LAU, POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil", SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" he sustained constitutional and statutory injuries.

## COUNT III
### FAILURE TO TRAIN IN VIOLATION OF 42 U.S.C. § 1983

51.   Plaintiff re-alleges Paragraphs 1 through 50 and incorporates them by reference as Paragraphs 1 through 50 of Count III of this Complaint.

52.   Plaintiff alleges that defendant THE CITY OF NEW YORK knows to a moral certainty that its employees will confront a given situation.

53.   Plaintiff alleges that the situation either presents the employee with a difficult choice of the sort that training will make less difficult or that there is a history of employees mishandling the situation.

54.   Plaintiff alleges that mishandling those situations will frequently cause the deprivation of a citizen's constitutional rights.

55.   Plaintiff alleges that as a result of defendant THE CITY OF NEW YORK's failure to train its employees, he sustained human rights, constitutional and statutory injuries.

## COUNT IV
## FAILURE TO SUPERVISE IN VIOLATION OF 42 U.S.C. § 1983

56.   Plaintiff re-alleges Paragraphs 1 through 55 and incorporates them by reference as Paragraphs 1 through 55 of Count IV of this Complaint.

56.   Plaintiff alleges that defendant THE CITY OF NEW YORK knows to a moral certainty that its employees will confront a given situation.

57.   Plaintiff alleges that the situation either presents the employee with a difficult choice of the sort that supervision will make less difficult or that there is a history of employees mishandling the situation.

58.   Plaintiff alleges that mishandling those situations will frequently cause the deprivation of a citizen's constitutional rights.

59.   Plaintiff alleges that as a result of defendant THE CITY OF NEW YORK's failure to supervise its employees, he sustained human rights, constitutional and statutory injuries.

## COUNT V
## RIGHT OF RELIGIOUS FREEDOM IN VIOLATION OF
## THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION
## AND 42 U.S.C. § 2000BB-1

60.   Plaintiff re-alleges Paragraphs 1 through 59 and incorporates them by reference

as Paragraphs 1 through 78 of Count V of this Complaint.

61.   Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras. MORgan was deprived of his rights in officers impeding the free

exercise of religion under the First Amendment of the United States Constitution, 42

U.S.C. § 2000BB-1 and 42 U.S.C. § 1983.

## COUNT VI
## UNREASONABLE FORCE IN VIOLATION OF
## THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## AND 42 U.S.C. § 1983

62.   Plaintiff re-alleges Paragraphs 1 through 61 and incorporates them by reference

as Paragraphs 1 through 61 of Count VI of this Complaint.

63.   Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras MORgan was deprived of his rights in officers both seizing the

plaintiff and the use of objectively unreasonable force under the Fourth Amendment

of the United States Constitution and 42 U.S.C. § 1983.

## COUNT VII
## EXCESSIVE FORCE IN VIOLATION OF
## THE FOURTEENTH AMENDMENT OF THE UNITED STATES
## CONSTITUTION AND 42 U.S.C. § 1983

64.   Plaintiff re-alleges Paragraphs 1 through 63 and incorporates them by reference

as Paragraphs 1 through 63 of Count VII of this Complaint.

65.   Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras MORgan was deprived of his rights in the use of excessive force and

in malicious prosecution under the Fourteenth Amendment of the United States

Constitution and 42 U.S.C. § 1983.

## COUNT VIII
## MALICIOUS FORCE IN VIOLATION OF
## THE EIGHT AMENDMENT OF THE UNITED STATES CONSTITUTION
## AND 42 U.S.C. § 1983

66.    Plaintiff re-alleges Paragraphs 1 through 65 and incorporates them by reference

as Paragraphs 1 through 65 of Count VIII of this Complaint.

67.    Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras. Morgan was deprived of his rights in the use of malicious force

under the Eight Amendment of the United States Constitution and 42 U.S.C. § 1983.

## COUNT IX
## MALICIOUS PROSECUTION IN VIOLATION OF
## THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## AND 42 U.S.C. § 1983

68.    Plaintiff re-alleges Paragraphs 1 through 67 and incorporates them by reference

as Paragraphs 1 through 67 of Count IX of this Complaint.

69.    Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras Morgan was deprived of his rights in the use of malicious

prosecution under the Fourth Amendment of the United States Constitution and 42

U.S.C. § 1983.

## COUNT X
## EXCESSIVE FORCE IN VIOLATION OF
## THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## AND 42 U.S.C. § 1983

70.    Plaintiff re-alleges Paragraphs 1 through 69 and incorporates them by reference

as Paragraphs 1 through 69 of Count X of this Complaint.

71.   Plaintiff alleges that as a direct result of acts, omissions, and policies of the

Defendants, Ras. Morgan was deprived of his rights in the use of excessive force

under the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

72.   Plaintiff alleges that defendants' THE CITY OF NEW YORK; OFFICER

WARREN LAU; POLICE OFFICER ONE "Caucasian Female" Hernse "She Devil";

SERGEANT ONE "African Male"; LIEUTENANT ONE, "Caucasian Male" actions

caused him physical, mental anguish and emotional distress.

## **REQUESTS FOR RELIEF**

WHEREFORE the Plaintiff respectfully request that the Court:

73.   Declare that Defendants' actions violated Ras OMeil NOVado Morgan rights

under the First Amendment of the United States Constitution;

74.   Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under the Fourth Amendment of the United States Constitution;

75.   Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under the Fourteenth Amendment of the United States Constitution;

76.   Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under the Eight Amendment of the United States Constitution;

77.   Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under the Thirteenth Amendment of the United States Constitution;

78.   Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under Universal Human Rights Declaration Articles 3;

79.    Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under Universal Human Rights Declaration Articles 4;

80.    Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights

under Universal Human Rights Declaration Articles 5;

81.    Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights under Universal Human Rights Declaration Articles 7;

82.    Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights under Universal Human Rights Declaration Articles 9;

83.    Declare that Defendants' actions violated Ras OMeil NOVado MORgan rights under Universal Human Rights Declaration Articles 12;

84.    Award compensatory damages for injuries sustained by Ras OMeil NOVado MORgan;

85.    Award punitive damages to Ras OMeil NOVado MORgan from the officers' who effectuated unreasonable force, used excessive force, false arrest, illegal imprisonment, malicious prosecution through issuing spurious summonses, and violation of religious freedom;

86.    Issue an injunction requiring the Defendants expunge from their records, plaintiff Iris photographed, plaintiff photographed without his had covered including but not limited to the NYPD's stop, question and frisk database, any information concerning Ras. OMeil NOVado MORgan relating to his November 2, 2014 and prior false arrest on October 1, 2010;

87.    Grant any other relief the Court deems necessary and proper.

Dated: Brooklyn, New York
November 1, 2017

Ras OMeil NOVado MORgan
*By Pro Se THE PLAINTIFF,*
956 East 84th Street
Brooklyn, NY 11236
Floor Basement
Telephone 929 378-9302
Email: omeil.morgan1@yahoo.com

# PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM

**SUMMARY NOTICE OF PRIVACY PRACTICES**
THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

**Purpose of this Notice:** FDNY is required by law to maintain the privacy of your health care information, known as protected health information (PHI), and to provide you with a notice as to how we may use this information and to whom it may be disclosed. We ask you to acknowledge your receipt of this notice and to consent to the release of this information for the purposes set forth in this notice, but we may nonetheless use and disclose your PHI for any purposes authorized by law.

**Uses and Disclosures of PHI:** We may use and disclose your PHI for the purposes of treatment, payment and other health care operations, including providing a copy of this Prehospital Care Report to the hospital to which you are transported; to obtain payment for the ambulance service that we provide to you; to monitor the quality of patient care provided by ambulance personnel; and to respond to complaints about the ambulance service provided to you. We may disclose your PHI to a relative, friend or other individual involved in your care. We may also use and disclose your PHI in connection with required public health reporting; for workers' compensation purposes; in connection with a legal claim or proceeding; to comply with a subpoena or other compulsory legal process; and for military, national defense, security and certain law enforcement purposes.

**Patient Access to PHI:** You may inspect and obtain a copy of your Prehospital Care Report by making a written request to the FDNY. Please be sure to include the CAD number on the bottom of this form. If you wish to obtain a copy of the Prehospital Care Report you will be charged a reasonable fee. Please note that your notarized authorization will be required. You have the right to request a copy of your PHI in electronic form if we maintain your PHI electronically. All requests for Fire Department Prehospital Care Reports should be mailed to FDNY Public Records Unit, 9 Metrotech Center, 1st Floor, Brooklyn, NY 11201-3857, and must enclose the required payment of $3.00 and a stamped, self-addressed envelope.

**Amending your PHI:** You may request that we amend the PHI that appears on the Prehospital Care Report if you believe that the information is incorrect. We will consider but may not be required to comply with your request.

**Restricting PHI Use and Disclosure:** You may request that we restrict our use and disclosure of your PHI. We will consider but may not be required to comply with your request. You may request that we not disclose your PHI to a health plan if you pay for services that we provided to you "out-of-pocket" and in full. We will comply with such request unless required to disclose the PHI by law. We will not sell or use your PHI for marketing purposes without your written authorization.

**Right to Request Confidential Communications:** You have the right to request that we communicate with you about your PHI in a certain way or at a certain location. To request confidential communications, contact the FDNY's Privacy Officer.

**Accounting of PHI Use and Disclosure:** You may request an accounting from us of our use and disclosure of your PHI after April 14, 2003, excluding use and disclosure of your PHI for treatment, payment and health care operations and as otherwise provided by law.

**Notification of Breach of Confidentiality:** You have the right to be notified of a breach of confidentiality of your unsecured PHI. We will notify you of any breach in accordance with applicable law.

**Changes in Privacy Practices:** Our privacy practices are subject to change without further notice, including changes affecting our use and disclosure of any PHI previously created or received. You may obtain a copy of our current or more comprehensive Notice of Privacy Practices by writing to the Privacy Officer of the ambulance provider. You may also obtain the current comprehensive FDNY Notice of Privacy Practice by accessing the FDNY web site: www.nyc.gov/fdny.

**Complaints:** All complaints regarding the use and disclosure of PHI may be made to the United States Department of Health and Human Services and/or to the FDNY's Privacy Officer.

**FDNY Privacy Officer:** You may contact the Fire Department's Privacy Officer by writing to FDNY Privacy Officer, Compliance Unit, FDNY Headquarters, 9 Metro Tech Center, Brooklyn, NY 11201-3857, or by calling the FDNY Complaint Hotline at (718) 999-2646.

**ANUNCIO DE PRÁCTICAS DE PRIVACIDAD**
Este anuncio describe cómo su información médica puede ser utilizada y revelada, y cómo usted puede acceder a esta información. Por favor revise esta información cuidadosamente.

**Propósito de este Anuncio:** El proveedor del servicio de ambulancia del FDNY es requerido por la ley a mantener la privacidad de su información de salud (tambien conocido como PHI), y de proporcionarle un aviso de cómo podemos utilizar esta información y hacia quien se puede divulgar. Le pedimos que acepte el recibo de este aviso y que consienta a que esta información se divulgue para los propósitos consignados en el presente aviso, pero sin embargo, podemos utilizar y divulgar su PHI para los propósitos autorizados por la ley..

**Usos y Divulgación de su PHI:** Podemos usar y divulgar su PHI para los propósitos de tratamiento médico, pagos y otras operaciones del cuidado médico, incluyendo la provisión de una copia del Reporte de Pre-hospitalizacion al hospital al que va ser trasladado; para obtener pago por el servicio de ambulancia que le proporcionamos; para monitorear la calidad del cuidado del paciente provisto por el personal de ambulancia; y para responder a las quejas relacionadas al servicio de ambulancia que se le proveyeron. Podemos divulgar su PHI a un familiar, amigo e otra persona que este relacionada en su cuidado. También podemos utilizar y divulgar su PHI en relación a los informes de salud pública requerida por la ley; y para reclamos por compensación de los trabajadores; en relación con una reclamación procedimiento legal; para cumplir con una citación e otro proceso legal obligatorio; y para los militares, la defensa nacional, la seguridad, y algunos fines policiales con respecto a las leyes de los EE.UU.

**Acceso del Paciente a su PHI:** Usted puede obtener una copia de su Reporte de Pre-hospitalizacion mediante una solicitud por escrito al FDNY. Por favor, asegúrese de incluir él número de CAD en la parte inferior de este formulario. Si desea obtener una copia de su Reporte De Pre-hospitalizacion, se le cobrará una tarifa razonable. Tenga en cuenta que se requiere su autorización notariada. Usted tiene el derecho de solicitor una copia de su PHI en forma electrónica si mantenemos su PHI en 'forma electrónica. . Todas las peticiónes solicitando un Reporte de Pre-hospitalizacion del FDNY deben ser enviados por correo a: FDNY Public Records Unit, 9 Metrotech Centre, Brooklyn, NY 11201-3857, y deben incluir tambien el pago requerido de $3.00) efectivo) y un sobre con estampilla y su nombre y direccion para el re-envio a su persona.

**Enmiendas a su PHI:** Si usted cree que la información que aparece en su Reporte de Pre-hospitalicacion es incorrecta, puedes solicitar que corrijamos la PHI. Su petición será considerada, pero tenemos la opción de no acceder a su solicitud.

**Restricciones en el Uso y Divulgación del PHI:** Usted puede solicitar que limitemos nuestro uso y divulgación de su PHI. Su petición será considerada, pero tenemos la opción de no acceder a su solicitud. Usted puede solicitar que no divulguemos su PHI a su plan de salud por ejemplo..si usted mismo paga por los servicios que le hemos proporcionado. Accederemos a tal solicitud a menos que seamos requeridos por ley a revelar informacion en el PHI. No vamos a vender o utilizar su PHI para fines comerciales sin su autorización por escrito.

**Derecho de Solicitar Comunicaciones Confidenciales.** Usted tiene el derecho de solicitar que nos comuniquemos con usted sobre su PHI de cierta manera o en cierto lugar. Para solicitar comunicaciones confidenciales, póngase en contacto con el funcionario de privacidad (Privacy Officer) del FDNY.

**Contabilidad del Uso y Divulgación de su PHI:** Usted puede solicitar una contabilidad de nosotros sobre nuestro uso y divulgación de su PHI despues del 14 de Abril del 2003, excluyendo el uso y divulgación de su PHI con relación al tratamiento, pago y operaciones de atención médica y según lo dispuesto por la ley..

**Notificacion de Violación de la Confidencialidad:.** Usted tiene el derecho de ser notificado de una violación de la confidencialidad de su PHI que no esta segura. Nosotros le notificaremos de cualquier incumplimiento tal como lo indique y de acuerdo a la ley.

**Cambios en las Prácticas de Privacidad:** Nuestras prácticas de privacidad están sujetas a cambios sin previo aviso, incluyendo cambios que afectan el uso y divulgación de cualquier PHI previamente creada o recibida. Puede obtener una copia de nuestro aviso actual o más amplio de practices de privacidad por escrito al funcionario de privacidad del proveedor de ambulancia. También puede obtener la corriente integral Aviso de Prácticas de Privacidad del FDNY mediante la direccion de internet del FDNY: www.nyc.gov/fdny.

**Reclamaciones:** Todas las reclamaciones referente al uso y divulgación de su PHI pueden ser dirigida al Departamento de Salud y Servicios Humanos de los Estados Unidos (US Department of Health and Human Services) o al funcionario de privacidad (Privacy Officer) del FDNY.

**Funcionario de Privacidad (Privacy Officer) del FDNY:** Puede comunicarse con el funcionario de privacidad del FDNY por escrito al: FDNY Privacy Officer, Compliance Unit, FDNY Headquarters, 9 Metrotech Center, Brooklyn, NY11201-3857.

**PATIENT INFORMATION RELEASE/ASSIGNMENT OF CLAIM**

By signing the authorization on the Prehospital Care Report, you are authorizing the holder of medical information about you to release to the Centers for Medicare and Medicaid Services and its agents or any entity that may be financially liable for ambulance or other services furnished to you or your dependent, any medical or other information necessary to process a claim for such services.

Emergency ambulance treatment and transport is NOT a free service, but will be provided to you regardless of your ability to pay. You are responsible for any charges resulting from this service that are not covered by your insurance, unless otherwise provided by law.

You further authorize and assign payment of Medicare and any other authorized benefits to the provider of ambulance service for ambulance and other services furnished to you.

**INFORMACION DEL PACIENTE / AUTORIZACIÓN PARA EL RECLAMO DE PAGO POR SERVICIOS BRINDADOS**

Al firmar la autorización en el Reporte de Pre-hospitalizacion, usted autoriza al poseedor de su información médica a divulgar cualquier información medica o de cualquier otro indole a los Centros de Servicios de Medicare o Medicaid y sus agentes o cualquier otra agencia responsable por el pago de servicios de ambulancia y otros servicios proporcionados a usted o a sus dependientes, para procesar el pago por dichos servicios.

Los servicios de emergencia en ambulancia y el transporte no es un servicio gratuito, pero se le brindarán independientemente de su capacidad de pagar. Usted es responsable de pagar todos los servicios que no están cubiertos por su seguro medico, a menos que se disponga lo contrario por la ley.

Además, usted autoriza y asigna al proveedor del servicio de ambulancias el pago de Medicare y cualquier otro beneficio autorizado para pagar los servicios de ambulancia e otros servicios que se le proporcionaron.

**Please take a few minutes to tell us about our service to you. Go to: http://www.nyc.gov/fdnyemssurvey**

**Por favor tome unos minutos para decirnos acerca de nuestro servicio proveidos a su persona en la direccion de internet:. http://www.nyc.gov/fdnyemssurvey**

**Patient Copy (Front)**

**DATE:** 11/2/14 **CAD#:** 3728

(Exhibit #1)

## REFUSAL OF MEDICAL ASSISTANCE

You have been advised that you require medical assistance and that the ambulance provider is prepared to render pre-hospital care and to transport you to a hospital (including a hospital of your choice, as explained in the Out of Area Transport/Diversion section below). You have further been advised that your refusal to accept such medical assistance may imperil your health, or result in death.

You have nonetheless refused to accept pre-hospital care and/or transportation to a hospital. You have agreed to assume all risks, consequences and costs of your decision not to accept pre-hospital care and/or transportation to a hospital, and you release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from your decision.

## RECHAZO Y EXONERACIÓN DE ATENCIÓN MÉDICA

Se le ha informado que necesita asistencia médica y que el proveedor del servicio de ambulancia está preparado para brindarle cuido pre-hospitalario y transportación a un hospital (incluyendo el hospital de su predilección como se explica más abajo en la sección de Transportación Fuera del Área-Asignada. Además se le ha informado que el rechazo de esta asistencia médica puede ser perjudicial para su salud o causarle la muerte.

Usted, sin embargo, ha negado aceptar el cuido pre-hospitalario y/o ser trasladado a un hospital. Usted está de acuerdo de asumir todos los riesgos, consecuencias, y costos incurridos por su decisión de rechazar cuido pre-hospitalario y/o ser trasladado al hospital, y exonera al proveedor del servicio de ambulancia, sus empleados, agentes y contratistas independientes de cualquier responsabilidad incurrida como consecuencia de su decisión.

| ☐ Pre-hospital care refused: | ☐ Transportation to hospital refused | ☐ Patient Unable to Sign | ☐ Patient Refused to Sign |
|---|---|---|---|
| List care refused: | | RMA Patient Signature | RMA Witness Name / Signature |

## OUT OF AREA TRANSPORT/DIVERSION

Out of Area Transport: You may request to be taken to a hospital of your choice that is no more than 10 minutes further away than the closest hospital appropriate for your care. If the hospital you request is more than 10 minutes further than the closest appropriate hospital, the ambulance personnel must first obtain the approval of an On-Line Medical Control physician. You accept the responsibility for any and all charges associated with the transport to the hospital that you have requested in the event that it is not covered by your insurance.

Diversion: You have requested to be transported to a hospital that is on diversion status. This means that the hospital has requested that they not receive additional ambulance patients because they may be unable to provide appropriate care in a timely manner.

We have recommended that we transport you to another appropriate hospital. Nonetheless, under certain circumstances, we will transport you to the hospital that you have requested, if you insist that we do so. You have indicated that you understand that you may experience delays in your care that may imperil your health or result in death.

## TRASLADO FUERA DEL ÁREA ASIGNADA / DESVÍO

Traslado fuera del Área Asignada: Usted puede solicitar ser trasladado al hospital de su preferencia que no esté a más de 10 minutos del hospital más cercano apropiado para su cuido médico. Si el hospital de su preferencia se encuentra a más de 10 minutos del hospital más apropiado para su cuido médico, el personal de la ambulancia tienen que primero obtener la aprobación del doctor a cargo de Control Médico. Usted acepta responsabilidad por todos los costos incurridos en su traslado al hospital de su preferencia que no estén cubiertos por su seguro medico.

Desvío: Usted ha solicitado su traslado a un hospital que esta en "estado de Desvío". Esto quiere decir que el hospital que usted solicitado no esta recibiendo más pacientes de ambulancias debido a que no pueden ofrecer un tratamiento adecuado por el momento.

Le hemos recomendado el trasladarle a otro hospital apropiado para su condición. Sin embargo, bajo ciertas circunstancias, si usted insiste, le trasladaremos al hospital que usted ha solicitado. Usted ha indicado que entiende que esto le puede causar atrasos conducentes a problemas de salud mucho más serios y hasta la muerte.

## ON-SCENE TRIAGE NOTICE

Your condition does not require transportation by ambulance to a hospital. You have been examined by the Emergency Medical Technicians or Paramedics from the Unit identified below, and they have consulted with a physician who has determined, in accordance with New York State law, that you do not require ambulance transport to a hospital either because you are not in need of emergency medical care or because you are neither sufficiently ill nor injured to require transportation by ambulance to a hospital. If you feel a mistake has been made, you may ask the crew to let you speak to the On-Line Medical Control physician.

If, after the ambulance has left, your medical condition worsens such that you require emergency ambulance transport to a hospital, you may call 911 again and explain the situation. If you call within 24 hours after the ambulance has left, give the operator the date and CAD number below. Please call 911 only for emergencies.

## AVISO DE EVALUACIÓN TRIAJE DEL PACIENTE EN LA ESCENA

Su condición no requiere el traslado por ambulancia, a un hospital. Usted ha sido examinado por un técnico de emergencia médica o paramédicos de la unidad abajo indicada. Ellos se han comunicado con un médico quien ha determinado, de acuerdo a las leyes del estado de Nueva York, que usted no requiere ser trasladado por ambulancia a un hospital, ya sea porque usted no necesita asistencia médica de emergencia o usted no está suficientemente enfermo o con heridas que requieran su traslado por ambulancia a un hospital. Si usted considera que un error se ha hecho, usted puede pedirle a la brigada de servicio de emergencia medica que le permita hablar con el médico de Control Medico en línea.

Si, después de que la ambulancia se ha ido, su situación empeora de tal manera que se requiere el transporte de emergencia en ambulancia a un hospital, usted puede llamar otra vez al 911 y explicarle su situación. Si usted llama dentro de las primeras 24 horas después de que la ambulancia se haya ido, por favor infórmele al operador de la fecha y el número de CAD que se encuentra a continuación. Por favor, llame al 911 para emergencias solamente.

| Date: | CAD No.: | Unit No.: |
|---|---|---|
| Fecha: | Número de CAD: | Número de Unit: |

## FREE & LOW COST HEALTH INSURANCE PROGRAMS

Many working families & individuals are eligible for free or low cost health insurance. You don't have to be a citizen to qualify for health insurance.

Child Health Plus B provides free or low-cost health insurance for children under the age of 19 who are not eligible for Medicaid.

Family Health Plan provides free health insurance for low-income, uninsured adults (ages 19-60) who are not eligible for Medicaid.

Medicaid provides free health insurance for low-income children (Child Health Plus A) and adults. Children under 21 have an added guarantee of all necessary screenings, treatment, assistance with appointments and transportation through the Child/Teen Health Program!

One application is used to apply for all of these programs.

Call HealthStat at 311, TTY 1-212-504-4115, www.nyc.gov/health

## PROGRAMAS DE SEGURO DE SALUD GRATIS O DE BAJO COSTO

Muchas familias trabajadoras o individuos son elegibles para un seguro de salud gratuito o de bajo costo. Usted no necesita ser ciudadano para calificar para este seguro de salud.

Plan de Salud Para Niños B ofrece seguro de salud gratuito y de bajo costo para niños menores de 19 años que no son elegibles para Medicaid.

Plan de Salud Familiar Mayor ofrece seguro de salud gratuito para adultos (entre las edades de 19 a 60 años) que no tienen seguro de salud y que por sus ingresos limitados no son elegibles para Medicaid.

Ayuda Medica (Medicaid) ofrece seguro de salud para niños (Salud Para La Ninez) MayorA) y adultos con ingresos limitados. Los niños menores de 21 años tienen una garantía añadida a través del Programa de Salud para Niños/Adolescentes que incluye todos los exámenes, medicos y tratamientos, ademas de ayuda con citas medicas y transportación como sean requeridos.

Solamente una aplicación se utiliza para solicitar todos estos programas. Llame HealthStat al 311, TTY 1-212-504-4115, www.nyc.gov/health

Page    1 of 1

## Patient Discharge Report
### Kings County Hospital Center Emergency Department

Printed on: Mon 11/03/2014 02:42          Patient Morgan,Omeil
Disposition Time 11/03/2014 02:35              MR# 2677577

Visit healthcare provider: Wiener,Sage

Attending Physician: Wiener,Sage

Diagnosis: Anxiety state, unspecified

Disposition: Discharged to Home or Self Care

Tests Performed:
Procedure(s): no procedures performed

Your doctor wants you to follow the custom instructions below:

  See Carenotes (Anxiety).

You were evaluated by the psychiatrist, who did not feel there was any acute
problem. Return to the ER if you have new symptoms such as thoughts of
suicide, hallucinations, or other new or worsening symptoms. Otherwise, you
may follow up in the Mental Health Building (R Building), in the first floor
Central Intake Unit.
Important Notes:
    In addition to following up as instructed, please contact your primary
doctor if your insurance assigns you one.  If you are having difficulty making
an appointment at Kings County, please call the Central Appointment Scheduling
office during business hours at
(718)245-3325.
    Only you can know when you are having an emergency.  If signs and symptoms
suggest that your condition is worsening, please contact a doctor immediately.
If you believe it is an emergency, please return to the ER or call 911.


_____              _____
Patient/Guardian signature               Physician/Provider signature

I have received these instructions and   I have reviewed these instructions with
had my questions answered                the patient.

(Exhibit #2)

## Anxiety

**WHAT YOU SHOULD KNOW:**

Anxiety is a condition that causes you to feel excessive worry, uneasiness, or fear. Family or work stress, smoking, caffeine, and alcohol can increase your risk for anxiety. Certain medicines or health conditions can also increase your risk. Anxiety may begin gradually, and can become a long-term condition if it is not managed or treated.

**INSTRUCTIONS:**

**Medicines:**

- **Medicines** can help you feel more calm and relaxed, and decrease your symptoms.

- **Take your medicine as directed.** Contact your healthcare provider if you think your medicine is not helping or if you have side effects. Tell him if you are allergic to any medicine. Keep a list of the medicines, vitamins, and herbs you take. Include the amounts, and when and why you take them. Bring the list or the pill bottles to follow-up visits. Carry your medicine list with you in case of an emergency.

**Follow up with your healthcare provider within 2 weeks or as directed:** Write down your questions so you remember to ask them during your visits.

**Manage anxiety:**

- **Go to counseling as directed.** Cognitive behavioral therapy can help you understand and change how you react to events that trigger your symptoms.

- **Find ways to manage your symptoms.** Activities such as exercise, meditation, or listening to music can help you relax.

- **Practice deep breathing.** Breathing can change how your body reacts to stress. Focus on taking slow, deep breaths several times a day, or during an anxiety attack. Breathe in through your nose, and out through your mouth.

- **Avoid caffeine.** Caffeine can make your symptoms worse. Avoid foods or drinks that are meant to increase your energy level.

- **Limit or avoid alcohol.** Ask your healthcare provider if alcohol is safe for you. You may not be able to drink alcohol if you take certain anxiety or depression medicines. Limit alcohol to 1 drink per day if you are a woman. Limit alcohol to 2 drinks per day if you are a man. A drink of alcohol is 12 ounces of beer, 5 ounces of wine, or 1½ ounces of liquor.

**Contact your healthcare provider if:**

- Your symptoms get worse or do not get better with treatment.

- You think your medicine may be causing side effects.

- Your anxiety keeps you from doing your regular daily activities.

- You have new symptoms since your last visit.

- You have questions or concerns about your condition or care.

**Return to the emergency department if:**

- You have chest pain, tightness, or heaviness that may spread to your shoulders, arms, jaw, neck, or back.

- You feel like hurting yourself or someone else.

- You feel dizzy, lightheaded, or faint.

© 2014 Truven Health Analytics Inc. All illustrations and images included in CareNotes® are the copyrighted property of A.D.A.M., Inc. or Truven Health Analytics.

**ANXIETY - AfterCare(R) Instructions(ER/ED), English
Generated on Monday, November 3, 2014 2:26:34 AM**



**CIVILIAN COMPLAINT REVIEW BOARD**
100 CHURCH STREET 10ᵗʰ FLOOR
NEW YORK, NEW YORK 10007 ♦ TELEPHONE (212) 912-7235
www.nyc.gov/ccrb

BILL DE BLASIO
MAYOR

RICHARD D. EMERY, ESQ.
CHAIR
BRIAN K. CONNELL
ACTING EXECUTIVE DIRECTOR

November 6, 2014

Mr. Omeil Novado Morgan
956 East 84th Street
Brooklyn, NY 11236

RE: OCD 201411263

Dear Mr. Morgan:

The Civilian Complaint Review Board (CCRB) acknowledges the receipt of your complaint.

The CCRB has jurisdiction to investigate complaints filed against officers of the New York City Police Department that allege excessive use of force, abuse of authority, discourtesy, or use of offensive language, including slurs relating to race, ethnicity, religion, gender, sexual orientation and disability. We have determined that your complaint does not fall within the board's jurisdiction, either because the allegations do not fall within our jurisdiction or because the subject of the allegations is a civilian employee of the police department.

The Office of the Chief of Department (OCD) of the New York City Police Department has jurisdiction to investigate complaints that question the validity of summonses and arrests, and the competence with which police officers perform their general duties; it is also authorized to investigate complaints filed against civilian employees of the police department. Therefore, we have referred your complaint to the Office of the Chief of Department for investigation.

An OCD control number has been obtained for you and it appears at the top of this page. An investigator assigned by the Office of the Chief of Department will contact you and will handle all further action regarding your complaint.

If you have any questions, please contact the Office of the Chief of Department, 300 Gold Street 3rd Floor, Brooklyn, New York 11201, telephone number (718)-834-3382. Please refer to your OCD control number when making all inquiries.

Sincerely,

Denise Alvarez
Director of Case Management

(Exhibit # 3)

In the matter of the Claim of

Ras OMeil NOVado MORgan

       - against -

CITY OF NEW YORK

NOTICE OF CLAIM

2015 JAN 26 PM 3: 16

**TO:**   **THE CITY OF NEW YORK**

     **PLEASE TAKE NOTICE** that the undersigned, **PRO SE,** claimant hereby makes claim and

demand against CITY OF NEW YORK as follows:

1.     The name and post office of the claimant is:

      OMeil NOVado MORgan
      PRO SE Claimant
      956 East 84th Street
      Brooklyn, NY 11236
      tel: 347 356-2856
      i-mail: omeil.morgan1@yahoo.com

2.     The nature of the claim: false arrest; unlawful imprisonment; malicious prosecution; malicious

abuse of process; failure to intervene; assault and battery; illegal search; negligence; gross negligence;

negligent screening, hiring, training, retention, and supervision; intentional infliction of emotional

distress; negligent infliction of emotional distress; prima facie tort; conspiracy; violation of privacy;

deprivations of the claimant's birth rights through God Law; claimant's rights through Universal

Declaration of Human Rights Articles 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19; and rights through

the 1st, 4th, 5th, 8th, 13th, and 14th Amendments to the United States of America Constitution and the NEW

YORK STATE Constitution.

3.     The time when, the place where, and the manner in which the claim arose:

     *On* Sunday 2nd of November 2014 beginning at approximately 10:10 p.m., on Church Avenue

(Exhibit #4)

by the corner of East 55th Street, Brooklyn, New York, in a New York City Police Department

motor vehicle, at Kings County Hospital, at NYPD central booking, and at an NYPD police

precinct.

The CITY OF NEW YORK, its agents, employees, supervisors, and police officers, acting

under color of law, unlawfully and without reasonable suspicion or any just cause racially

motivated stopped, detained, kidnapped, searched, arrested, and imprisoned claimant.

At the above mentioned location, claimant was lawful traveller on the roadway when NYPD

police officers racially motivated illegally stopped, grabbed, and searched claimant and place

overly tight handcuffs on claimant's wrist.  Claimant calling, prior to being handcuffed, 911 out

of fear and claimant's plea for help to 911 operator were both answered with ambulance that

arrived on scene after claimant was handcuffed and placed in NYPD officers motor vehicle.

Claimant's anxiety in fear, in worry, in uneasiness, and in nervousness, which has not gotten any

better, of NYPD officers resulted in claimant seeking medical treatment at Kings County

Hospital where claimant was transported with NYPD officer by ambulance while handcuffed.

Where claimant's diagnosis anxiety state, unspecified to be discharged to home or self care.

Thereafter, claimant's released from Hospital approximately 3:00 am, when NYPD officers

transported by NYPD motor vehicle claimant to a NYPD precinct, where claimant objected to

being fingerprinted and objected to being photographed, which was done under duress with

claimant head covered with his shirt as claimant turban against claimant protest was forcefully

removed.  Claimant's turban was forcefully pulled off his head while being held by many

NYPD officers at a NYPD precinct.  Further, NYPD officers forcefully remove claimant turban

in violating claimant's liberty in the free exercise of his Rastafari way of life in faith through

His Imperial Majesty Emperor Haile Selassie I.  At a NYPD precinct, officers imprisoned

claimant therein until later that morning when they transported claimant to NYPD central

booking by NYPD motor vehicle.  Furthermore, at NYPD central booking, under duress by

NYPD officers threat that claimant would be held indefinite in detention due to refusal of

claimant to not being fingerprinted at a NYPD precinct.  At NYPD central booking, claimant's

turban was removed in being photographed for second time for prisoner movement slip

photograph .  Thereafter, later in the afternoon on November 3, 2014, claimant arraignment at

Criminal Court of the CITY OF NEW YORK when claimant was released on his own

recognizance to return to court.

    The above actions of NYPD officers were witnessed by other NYPD officers who failed to

intervene in the illegal conducts described herein.  In so doing, the CITY OF NEW YORK and

its employees intentionally, recklessly, and negligently caused physical and emotional injuries

and distress to claimant.

4.      The claimant seeks, among other things, the following relief: monetary redress for injuries to

claimant's well being, the full extent of which are as yet not fully determined.  Claimant claims

damages for physical, mental, and psychological pain and suffering,, embarrassment, humiliation, and

punitive damages, and diverse general and special damages, and damages under 42 USC Sec. 1983.

5.      The total damages claimed: the claimant seeks the maximum jurisdictional amount of monetary

damages allowed under the laws of the United States and New York State, and claimant will ask a jury

of his peers to decide the amount of damages deemed appropriate.


    The undersigned claimant therefore presents this claim for adjustment and payment.  You are

hereby notified that unless it is adjusted and paid within the time provided by law from the date of

presentation to you, the claimant intends to commence an action on this claim.


OMeil NOVado MORGan by PRO SE

## VERIFICATION

STATE OF NEW YORK    )
                                   )
COUNTY OF KINGS       )

        OMeil NOVado MORgan affirms through our Holy Supreme God truth and says;

1.    Claimant is PRO SE in the within action.

2.    Claimant has read the foregoing claim and knows its contents.

3.    Claimant affirm the foregoing is God truth based on the statements made by claimant.


OMeil NOVado MORgan by PRO SE

956 East 84th Street
Brooklyn, New York, 11236
tel: 347 356-2856
i-mail: omeil.morgan1@yahoo.com


Sworn to before me this day
January 26th, 2015

NOTARY PUBLIC

ALEXANDER COY
Notary Public - State of New York
NO. 01CO2084048
Qualified in Kings County
My Commission Expires Jun 17, 2017

**THE CITY OF NEW YORK OFFICE OF THE COMPTROLLER**

1 CENTRE STREET, NEW YORK, N.Y. 10007-2341

Scott M. Stringer
**COMPTROLLER**

015 - 188

Date: 01/30/2015
Claim no: 2015PI002420
Claimant: RAS OMEIL NO VADO
MORGAN
Date of Occur: 11/02/2014

RAS OMEIL NO VADO MORGAN
956 E 84 ST
BROOKLYN, NY 11236

The above claim is being reviewed. In order to properly evaluate this claim, please complete the items which are marked and return the form.

( x ) Claimant's social security # _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_

( x ) Claimant's date of birth _22 JUNE 1978_

( x ) Copy of final disposition _JULY 14, 2015_

( x ) Precinct of occurrence _67th_

( x ) Name and shield # of arresting officer _WARREN LAU, 12575_

( x ) Copy of arrest report, rap sheet and, if filed, CCRB report

( x ) Related medical records, particularly emergency room & ambulance records.

( x ) Medicaid and/or Medicare lien? _N/A_

( x ) Medicaid/CIN # _____

(x) Any other information and or documents pertinent to your claim

If you have any questions, feel free to contact CHARLES CASTALDO at (212) 669-4765.

Sincerely yours,

_Charles Castaldo_

CHARLES CASTALDO
EXAMINER - PERSONAL INJURY DIVISION
Bureau of Law & Adjustment - Room 1220

(Exhibit #5)



**THE CITY OF NEW YORK OFFICE OF THE COMPTROLLER**
1 CENTRE STREET, NEW YORK, N.Y. 10007-2341

**Scott M. Stringer**
COMPTROLLER

Date: 03/11/2015

### NOTICE OF 50-H HEARING

015 - 274

RAS OMEIL NO VADO MORGAN
956 E 84 ST
BROOKLYN, NY 11236

Re:Claimant Name : RAS OMEIL NO VADO
MORGAN
ClaimNumber: 2015PI002420

Dear Sir / Madam:

Please take notice that, pursuant to Section 50-h of the General Municipal Law(GML), claimant is mandated by law to appear at the following location, at the date and time specified below, to be orally examined under oath relative to the occurrence and extent of injuries for which the above claim is made:

Date of Hearing: 05/21/2015
Time of Hearing: 11:30 AM

Location of Hearing: JANE BARRETT AND ASSOCIATES, LLC (#2)
188 MONTAGUE STREET  SUITE 402
BROOKLYN, NY 11201
(718) 237-3400

The claimant should be accompanied by his or her attorney and all infant claimants must appear. Claimant is further mandated, pursuant to Section 93(d) of the New York City Charter and Section 50-h of the GML, to present him/herself for a physical examination at a date and location to be provided under separate cover.

You will be called by the law office above to confirm the date and time of the hearing.  At that time you can request a language interpreter for your client, if necessary.  **If an interpreter has been ordered and the claimant or counsel fails to appear for the hearing without giving 48 hours prior written notice, counsel will be charged for the cost of the interpreter.**

Exhibit#6\

ORIGINAL

50-H HEARING

- - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Claim of

Ras OMeil NOVado MORgan

                              -against-

CITY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - x

BLA#: 2015PI002420


                              188 Montague Street
                              Brooklyn, New York

                              May 27, 2015
                              10:00 a.m.


**EXAMINATION** of **RAS OMEIL NOVADO MORGAN,**

held at the above time and place, pursuant to

Notice, taken before Stephanie McElroy, a

reporter and Notary Public within and for the

State of New York.


LEX #110789



**LEX**

**REPORTING SERVICE, INC.**

PROFESSIONAL REPORTING SINCE 1980

TOLL FREE 800.608.6085

(Exhibit #7)

2

A p p e a r a n c e s :


      RAS OMEIL NOVADO MORGAN
          Claimant, pro se
          956 East 84th Street
          Brooklyn, New York 11236


      JANE BARRETT & ASSOCIATES, LLC
          Attorneys for Respondent
          188 Montague Street, Suite 402
          Brooklyn, New York 11201
   BY:  GEORGE SAWAYA, ESQ., of Counsel

R. O. N. Morgan                    4

1

2     If you choose to go forward now, that is your

3     choice.

4         A      Thank you, sir.  I would not wish

5     to adjourn the hearing.  So I would -- I need

6     to proceed representing myself pro se.

7         Q      Very well.  I would ask during

8     the hearing that you keep your voice up.

9         A      Yes.

10        Q      I would also ask that you make

11    all of your answers in words rather than

12    gestures.  Now, the reason for that is the

13    reporter.  In other words, for instance, if

14    you shake your head like this, I know that

15    you mean yes but she cannot type that into

16    her machine.  So please use words instead.

17        A      I understand.

18        Q      Also, I would ask that you wait

19    until I finish my question before you begin

20    your answer.  The reason for that, once

21    again, is the reporter in that she cannot

22    take down the words of two people speaking at

23    the same time.  So for example, I may be in

24    the process of framing a question and before

25    I am quite finished with it, while I am still

R. O. N. Morgan                        6

1    through Rastafari, through Haile Selassie

2    1st.

3         Q      With only the year going on the

4    record, may I have your full date of birth?

5         A      Yes, 1978.

6         Q      What was your place of birth?

7         A      Claredon, Jamaica, West Indies.

8         Q      How long have you been in the

9    United States?

10        A      I have been in the United States

11   twenty-six years.

12        Q      Now, may I have, off the record,

13   your Social Security number?

14                   (Whereupon, an

15                   off-the-record discussion was

16                   held.)

17        Q      How long have you lived at your

18   current address?

19        A      I have lived at 956 East 84th

20   Street for the past fifteen years.

21        Q      Does anybody live there with you?

22        A      Yes.

23        Q      Who is that?

24        A      My family house.  My mother, my

R. O. N. Morgan                                8

2    A      Company's policies.

3    Q      Which policy was it?

4    A      Tardiness.

5    Q      How do you currently support

6    yourself?

7    A      I'm currently assisted by the

8    family.

9    Q      Do you receive Medicaid?

10   A      What is Medicaid?

11   Q      It is a federal program for

12   medical assistance to indigent or poor

13   people.

14   A      I do receive medical insurance.

15   I'm not certain if it's classified as

16   Medicaid.

17   Q      Thank you.

18   A      You're welcome.

19   Q      What was the date of the

20   beginning of the incident that you are

21   complaining about?

22   A      The date, Sunday, 2nd of

23   November 2014.

24   Q      What time of day did the incident

25   begin?

R. O. N. Morgan                              10

1
2   this time?

3        A      Yes.

4        Q      What was the make, model and year

5   of the vehicle that you were operating?

6        A      May I reference my records?

7        Q      No.  It is whatever you recall.

8   If you do not recall, that is the answer.

9        A      Okay.  As to the make or the

10  model, I don't recall.

11       Q      Was it a four-door sedan or some

12  other kind of vehicle?

13       A      Four-door car.

14       Q      Who was the owner of that

15  vehicle?

16       A      The owner is Josephina Kellman.

17       Q      Spell Kellman, please.

18       A      K-E-L-L-M-A-N.

19       Q      Where does she live?

20       A      Brooklyn, New York.

21       Q      What address, if you know?

22       A      I don't know.

23       Q      She is a relative of yours?

24       A      Yes.

25       Q      Which relative?

R. O. N. Morgan                    12

order?

         A      Yes.

         Q      Were they on or off as you were
driving from your home?

         A      On.

         Q      As you reached Church Avenue and
East 55th Street, what happened?

         A      The light turned from green to
yellow, I slowed down to stop and did stop.
After stopping, I waited to proceed as the
light turned green.  When the light turned
green, I proceeded across the street of East
55th.

         Q      At this time, you were traveling
on Church, correct?

         A      Still on Bob Marley Boulevard,
formerly Church Avenue.

         Q      When you proceeded across East
55th Street, what happened next?

         A      The flashing light from a City of
New York police vehicle signaled the pulling
over of the vehicle on the opposite side as I
started to proceed.

         Q      Was this a marked police car?

R. O. N. Morgan                    14

pocket that I had on.  I had on not the pants

that I had on for the day.  I just showered

so my pants that my wallet was in was home.

Q        After you explained that to the

officer, what happened next?

A        The officer insisted on

registration and documentation.  I gave the

officer a United States passport.  Prior to

giving the officer a United States passport,

I read the first page of the United States

passport.

Q        Why did you do that?

A        God told me to read the first

page of the United States passport.

Q        And in sum and substance, what

did the first page say?

A        The first page spoke of aid being

provided when needed and for the Secretary of

State requesting the agents of the City of

New York to not hinder my movement to what I

had set out to do in returning Mrs. Kellman,

transport to her and picking her up from the

bus stop.

Q        After you said this to the

R. O. N. Morgan                    16

1

2      front or behind?

3            A       Behind.

4            Q       Were you searched?

5            A       Yes.

6            Q       Did the police take anything from

7      you at this time?

8            A       The officer had my passport.  I

9      had nothing else for the officers to take.

10     The vehicle had the keys remaining in the

11     vehicle and the telephone that I had on was

12     also taken by one of the other officers on

13     the scene.

14           Q       Did you eventually get those

15     items back?

16           A       I received the phone after I was

17     released on November 3rd.

18           Q       Did the police search the

19     vehicle?

20           A       I do not know.

21           Q       To the best of your knowledge, do

22     you know whether anything was missing from

23     the vehicle after the police stopped you?

24           A       To the best of my knowledge, I do

25     not know.

R. O. N. Morgan                    18

         A        You're welcome.

         Q        After the ambulance arrived, what

happened next?

         A        Instead of being taken by the

officers, I was then removed from the

officer's transport and I was then taken by

the ambulance persons to the ambulance.

         Q        Were you still handcuffed at this

time?

         A        I was still in handcuffs.

         Q        Did a police officer also enter

the ambulance?

         A        Yes.

         Q        Did the EMTs do anything for you

at the scene?

         A        The EMT person, all she did was

to take my vitals.

         Q        What happened next?

         A        While in handcuffs, I am

transported to the hospital, Kings County.

         Q        How long a period of time did you

spend at Kings County Hospital?

         A        Approximately three hours or more

from the incident of initial 10:10.

R. O. N. Morgan                    20

1

2    not?

3         A       Correct.

4         Q       Let me ask you this.

5                 Did they offer you medication?

6         A       No.

7         Q       How long did the interview by the

8    medical staff take, the evaluation?

9         A       I don't recall.

10        Q       Did you remain handcuffed while

11   you were in the hospital?

12        A       Yes.

13        Q       Did they do anything else for you

14   in the hospital?

15        A       No.

16        Q       Did you make any kind of physical

17   complaint at the hospital?

18        A       No.

19        Q       After you left the hospital,

20   where did you go?

21        A       I was transported by three City

22   of New York Police Officers to the precinct.

23        Q       Which precinct was that?

24        A       The precinct located at Nostrand

25   Avenue and Snyder.

R. O. N. Morgan                    22

2       A        I contacted 911.

3       Q        What did you say to 911?

4       A        I explained the situation, what

5  was taking place.  I explained my anxiety of

6  the City of New York Police Department.

7       Q        Did you tell 911 anything else?

8       A        I don't recall.  I have requested

9  those records from the City of New York.  To

10 date, I have not received any record of the

11 transcript to the SPRINT report.

12      Q        At the time that you were

13 stopped, how were you dressed?

14      A        I was in a red turban.

15      Q        That was on your head?

16      A        The same color that is on my head

17 today.

18               MR. SAWAYA:  Let the record

19               reflect that he is wearing a red

20               turban now.

21      Q        When you got to the hospital, was

22 the turban still on?

23      A        Yes.

24      Q        When you got to the police

25 station, was the turban still on?

R. O. N. Morgan                    24

    A    I was never given back the turban until I'm being transported from the 67th Precinct. I had taken the shirt, the red shirt that I was wearing, to cover my head after my turban was forcefully removed.

    Q    Now, at the precinct, did any officers ask you any questions?

    A    Yes.

    Q    What did they ask you?

    A    I was told I will not leave the precinct if I'm not fingerprinted.

    Q    Did they attempt to fingerprint you before that?

    A    Yes.

    Q    Did you resist their efforts to fingerprint you?

    A    I did not resist. I objected.

    Q    Well, before you left the precinct, were you fingerprinted?

    A    No.

    Q    Did the officers ask you any other questions?

    A    Yes.

    Q    What did they ask you?

R. O. N. Morgan                    26

 1

 2        Q        Did you ever get your turban

 3    back?

 4        A        Yes.

 5        Q        Other than the turban, did the

 6    police take anything else from you when you

 7    were at the precinct?

 8        A        No.

 9        Q        Did you ask them any questions

10    while you were at the precinct?

11        A        I don't recall.

12        Q        From the precinct, where were you

13    taken?

14        A        I was transported with other

15    persons in the holding area from the 67th

16    Precinct Downtown Brooklyn in a paddy wagon

17    with officers and I was taken to a big

18    building.  I assume it's the courthouse that

19    I eventually saw a judge on the 3rd of

20    November.

21        Q        When you were at this building,

22    were you provided with an attorney?

23        A        I was asked if I needed an

24    attorney.  I spoke to an attorney and I

25    explained that my choice to proceed pro se is

R. O. N. Morgan                    28

Q      What was wrong with your license?

A      She did not tell me what was

wrong with my license, but she told me to go

to DMV to get my license fixed.

Q      When you went in front of a

judge, what happened?

A      I was told that I will be

returning to court.

Q      Did the judge set a bail or did

he release you on your own recognizance?

A      I was released on my own

recognizance.

Q      When were you told that you had

to return to court?

A      January 6, 2015.

Q      Did you return on that date?

A      Yes.

Q      Did you have an attorney or were

you still pro se at that time?

A      There was an attorney

representing me.  When I appeared in front of

the judge your Honor, I requested to proceed

pro se.  The honorable judge gave me

permission as in proceeding pro se and the

R. O. N. Morgan                    30

Q      To when?

A      The case was adjourned for trial
and hearing and that was scheduled May 6th.

Q      Were you pro se on that date?

A      Yes.

Q      What happened in court on May
6th?

A      I was ready for trial.  The
people were not ready.  The case has been
adjourned until July 7, 2015.

Q      Do you recall what the charge
against you is?

A      No.  I don't recall.

Q      Okay.

Now, what part of the day on 11/3
were you released?

A      In the afternoon.  Approximately
2 o'clock.

Q      When you were released, where did
you go?

A      Home.

Q      What did you do when you got
home?

A      I put the paper that I was given

R. O. N. Morgan                    32

2          Not counting your trip to Kings

3    County under arrest, did you receive any

4    other medical attention for anything that

5    happened in this incident? .

6          A       I have not.

7          Q       Have you received any psychiatric

8    or psychological attention?

9          A       I have not.

10         Q       Were you ever fingerprinted?

11         A       Yes, under duress.

12         Q       Where, at the courthouse?

13         A       At the court, at the holding

14   cell.

15         Q       What happened to your cousin's

16   car?

17         A       The car was picked up by her from

18   the 67th Precinct.

19         Q       Did it have any damage to it?

20         A       I don't know.

21         Q       In addition to what you have

22   already told me, has this incident had any

23   affect on your life?

24         A       Yes.

25         Q       Tell me how.

R. O. N. Morgan                    34

1

2          Q       Is there anything that you would

3   like to add to any way this incident has

4   affected you?  You do not have to repeat what

5   you have already told me, but is there

6   anything else that you want to tell me?

7          A       Yes.

8          Q       Go ahead.

9          A       As to the incident, I have

10  reenrolled to complete my studies in college

11  to pursue legal studies as to the impact that

12  this incident and previous incidents dealing

13  with the City of New York Police Department

14  has impacted myself and the community on the

15  whole, being a representative of Rasta.  And

16  the impact as the legal issues that we see

17  today is linked to what my foreparents

18  experienced in shackled slavery in these

19  United States of America.  So based on my own

20  experience being shackled and handcuffed, I

21  have embarked on the whole legal study to

22  correct the abuse that has been done.  And in

23  this 150 years of the 13th Amendment to this

24  United States Constitution, which now

25  subjects me, an individual, a real person, to

R. O. N. Morgan                    36

2    that I have for my loved ones, for the people

3    around me, as to my inability to even share

4    with them a lot of things that is happening.

5    And for that fear that I have for them.  Not

6    for myself.  But the fear that I have for

7    them as to what is happening to me, I just

8    wish the record to be recorded as to what

9    happened and the fact that I am not

10   committing any crime as a real individual in

11   these United States.  And I am praying that I

12   am not subjected to further violation of not

13   just my Constitutional Rights but my human

14   rights, my God-given rights, to be a real

15   person and to live with God and show love to

16   each and everyone.

17        Q      Is there anything else that you

18   would like to add?

19        A      No, sir.

20        Q      At the time that you were

21   detained at the scene on Marley and 55th

22   Street, were there any people in the vicinity

23   other than police officers?

24        A      Yes.  There were onlookers.

25        Q      Do you know the names of any of

R. O. N. Morgan                    38

2    A      Yes.

3    Q      How much?

4    A      Settlement of $20,000.00.

5    Q      Any other claims besides that

6    one?

7    A      The claim within my October

8    1, 2010 case included a second incident

9    against the City of New York.  So both claims

10   was settled in the Federal Eastern District

11   Court for $20,000.00.

12   Q      Any other claims besides those?

13   A      No.

14   Q      To the best of your knowledge,

15   does the City have any liens against you?

16   That means, do you owe them any money?

17   A      To the best of my knowledge, no,

18   sir.

19   Q      Have you ever been convicted of a

20   crime?

21   A      No.

22   Q      Have you ever gone by any name

23   other than Omeil Novado Morgan?

24   A      Yes.

25   Q      What other name or names have you

```
 1               R. O. N. Morgan                    40
 2    something else?
 3        A       They stated that agency would be
 4    the agency in dealing with my investigation.
 5        Q       Mr. Morgan, thank you very much.
 6    I have no further questions.
 7        A       Thank you so much for your time.
 8                       -o0o-
 9                (Whereupon, the examination
10        of Ras OMeil NOVado MORgan was
11        concluded at 10:44 a.m.)
12    Affirm in H.I.M. Haile Sclassie I
13    R.T.S. Ras OMeil NOVado MORgan
14                RAS OMEIL NOVADO MORGAN
15
16    Subscribed and sworn to
17    before me this _____ day
18    of _____, 2015
19
20    _____
21    NOTARY PUBLIC
22
23
24
25
```

## ERRATA SHEET

The following are my corrections to the
attached transcript:

| PAGE | | LINE | SHOULD READ |
|------|---|------|-------------|
| 7 | * | 2 | father, My two sisters, a nephew and two |
| 13 | * | 21 | did not have anything on that my wallet was not |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |
| ____ | * | ____ | _____ |

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

CERTIFICATE OF DISPOSITION
NUMBER:  549216

THE PEOPLE OF THE STATE OF NEW  YORK
                        VS

MORGAN,OMEIL
Defendant

06/22/1978
Date of Birth

956 EAST 84 ST
Address

NYSID Number

BROOKLYN              NY  11236
City              State  Zip

11/03/2014
Date of Arrest/Issue

Docket Number: 2014KN082928

Summons No:

VTL 511.1A
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|------|-------------|-------|------|
| 07/14/2015 | DISMISSED AND SEALED | YAVINSKY,M | TRIAL1 |

SEALED

pursuant to Section 160.50 of the CPL

NO FEE CERTIFICATION

_ GOVERNMENT AGENCY        _ COUNSEL ASSIGNED

_ NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNE

SOURCE  _ ACCUSATORY INSTRUMENT  _ DOCKET BOOK/CRIMS  _ CRC3030[CRS963]

    I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

DUDLEY,R                          07/23/2015        FEE: NONE
COURT OFFICIAL SIGNATURE AND SEAL    DATE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
         SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

(Exhibit #8)

In the Matter of Claim of

Ras OMeil NOVado MORgan

                              Date:  10/26/2015
                              Claim No:  2015PI002420
                              Re:  Claimant's First Settlement
                              Importune

         -against -

CITY OF NEW YORK

**TO:**   **THE CITY OF NEW YORK**

        **PLEASE TAKE NOTICE,** that through, King of King and Lord of Lord

Conquering Lion of the Tribe Of Judah His Imperial Majesty Emperor Haile

Selassie I, First Power of Holy Trinity, Elect of God.  I am, the claimant, Ras OMeil

NOVado MORgan by Pro Se, who presents this settlement importune on the CITY OF

NEW YORK, in the amount One Billion Dollars (1,000,000,000.00), as to claim

number **2015PI002420**.  Now, the facts of incident shows, claimant is the victim in

various violations on Sunday, 2nd November 2014 of his God Given Rights, Universal

Human Rights, and Rights in all treaties championing Human Liberty that being

violated by the City of New York Police Department Unconstitutional widespread

policies of Broken Window, Stop, Question, and Frisk.  As such, in reviewing CITY

OF NEW YORK policies, the Amendment Fourteenth of United States Constitution is

appropriate that reads, "No State shall make or enforce any law which shall abridge

the privileges or immunities of citizens of the United States; Nor shall any state

deprive any person of life, liberty, or property, without due process of law; nor deny to

any person within its jurisdiction the equal protection of the laws".  Also, the

Amendment Four of United States Constitution that provides further clarity reads,

(Exhibit#9)
1.

"The right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to searched, and the persons or things to be seized".  Thereupon, Pro Se Claimant's Settlement Importune is made in his effort to move forward with his life in Self Healing from impacts of Sunday 2nd November 2014 incident with NYPD Officers, which then turn into malicious prosecution through Criminal Court proceedings that ultimately ended in dismissal of charge against him as Pro Se Defendant.  On no fault of his own, this incidents have caused claimant unprovoked anxiety, mental, physical, emotional, and psychological damages.

From Claimant's Notice of Claim # **2015PI002420** , As to nature of claim: Deprivation of Claimant's Birth Rights through God Law; False arrest; Unlawful Imprisonment, Malicious Prosecution; Malicious Abuse of Process; Failure to Intervene; Assault and Battery; Illegal Search; Negligence; Gross Negligence; Negligence Screening, Hiring, Training, Retention, and Supervision; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Prima Facie Tort; Conspiracy; Violation of Privacy; Claimant's Rights through Universal Declaration of Human Rights Articles: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19; and Rights through the 1st, 4th, 5th, 8th, 13th, and 14th Amendments to the United States of America Constitution and New York State Constitution.  Furthermore, as what claimant seeks, among other things, the following relief: Monetary redress for damages to claimant's well being, which the full extent are not as yet fully been determined.  Claimant claims damages for physical, mental, and psychological pain

and suffering, embarrassment, humiliation, and punitive damages, and diverse general and special damages, and damages under 42 USC Sec. 1983.

As we Commemorate 150th years, The United States Civil War ending and the ending of Slavery, except as a punishment for crime, with the Thirteenth Amendment to United States Constitution, Let we acknowledge that the nation's internal war was really regarding this institution of slavery. Aftereffect, in this present time 2015, I am subjected to slavery, "as punishment for crime whereof the party shall have been duly convicted in these United States, or any place subject to their jurisdiction". Truly, I feel how I ancestors feel in chattel slavery as I walked hands handcuffed from behind, while I together with other prisoners walked, from a NYPD transport automobile van, down into a holding pen or underground jail, on early morning before sun rise of November 3, 2014. Vividly, I remember slavery as if it was only yesterday from this heartfelt experience through the criminal justice system. On that account, I speak as a slave from feeling shackles in the form of handcuffs and hearing sounds in the opening and in the closing of slave pen, the jail gates. I was taken to an Auction block in the form of a Court Room, in seeing the Judge, to determine value of I person in remanding or releasing on own recognizance. Forasmuch, I live to be free as I am born free. Hence, Slavery is real as I still feel handcuffs of the slave catchers or NYPD Officers that are agents of CITY OF NEW YORK. I know this truth, "even in this 21st century with, Love, Faith, Truth, Courage, and Just Cause, David will still defeat Goliath." through H.I.M. Haile Selassie I.

I heart-fully inquire that the CITY OF NEW YORK institute a commission on slavery institutions in researching the CITY's business history in African slave trade, slavery, and criminal justice system that is linked to slavery as punishment for a crime

according to the 13th Amendment of United States Constitution.  As a result of these truths, the African Individuals need reparation from the institutions American slavery built, the CITY OF NEW YORK imperative apology for its major business role in slavery and CITY's continued profiting from the legacies of slavery.  As a prerequisite to reparation from slavery in these United States, the ending of slavery in all its form is first step.  Henceforth, In the 13th Amendment to the United States Constitution there is found a violation of International law.  Specifically, the Universal Human Rights Declaration article IV states, which United States is signatory, "No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms".  With this open reasoning on slavery, the souls of I ancestors rejoice in truth's judgment victory of good over evil.

I am, Ras OMeil NOVado MORgan, the authorize claimant who accordingly presents this Settlement Importune on claim number **2015PI002420** against the CITY OF NEW YORK for adjustment and payment.  Henceforth, the CITY OF NEW YORK is hereby notified that unless claim is adjusted and paid within the time provided by law from the date Sunday of 2nd November 2014, the claimant intends to commence an action on this claim.  Furthermore, for whatever reason, if the CITY OF NEW YORK is unable to resolve this claim since claimant presenting Notice of claim to the Office of Comptroller, the claimant will seek the maximum jurisdictional amount of monetary damages allowed under International laws, the laws of the United States and New York State and the claimant will ask a jury of his peers to decide the amount of damages that is justice appropriate in equity, honesty, integrity and Love. **As a rule to filing a New York State litigation, any lawsuit against the CITY must be started within one year and ninety day from the date of the occurrence.**

If you have any questions regarding this settlement importune for

claim # **2015PI002420**, you may contact via standard mail or email, Ras OMeil

NOVado MORgan.


Dated:  Brooklyn, New York

October 26, 2015

Truly,

Ras OMeil NOVado MORgan
*By, Pro Se, The Claimant*


<u>Via Hand Delivery, To :</u>

THE CITY OF NEW YORK
OFFICE OF THE COMPTROLLER
Mr. Scott M. Stringer, Comptroller
1 CENTRE STREET,
NEW YORK, NY 10007-2341


THE CITY OF NEW YORK
OFFICE OF THE COMPTROLLER
CLAIMS AND ADJUDICATIONS
Mr. Micheal Aaronson,
Chief, Bureau of Law and Adjustment
1 CENTRE STREET,
NEW YORK, NY 10007-2341

Omeil_MORgan_Settlement_Importune_CITY_OF_NEW_YORK_**2015PI002420**

## VERIFICATION

STATE OF NEW YORK      )
                       )
COUNTY OF KINGS        )

Ras OMeil NOVado MORgan affirmation through Holy Supreme God

truth, King of King and Lord of Lord Conquering Lion of the Tribe Of Judah His

Imperial Majesty Emperor Haile  Selassie I, First Power of Holy Trinity, Elect of God.

1. Claimant is Pro Se in the Settlement Importune on claim # **2015PI002420**.

2. Claimant has read the foregoing Settlement Importune to the CITY OF NEW

   YORK on claim # **2015PI002420** and knows its composition.

3. Claimant affirmation of the foregoing is God truth based on the statements

   made by Ras OMeil NOVado MORgan, the claimant, by Pro Se.

Ras OMeil NOVado MORgan
*By, Pro Se, The Claimant*

956 East 84th Street
Brooklyn, New York, 11236
i-mail: omeil.morgan1@yahoo.com

Sworn to before me this day
October 26th, 2015

NOTARY PUBLIC

WINSTON LLOYD WATSON
Notary Public, State of New York
No. 24-4708949
Qualified in Kings County
Commission Expires August 31. 2018

6.
Omeil_MORgan_Settlement_Importune_CITY_OF_NEW_YORK_**2015PI002420**